STATE OF MISSOURI, Respondent, v. WILL HOGLE, Appellant.

Springfield Court of Appeals, May 8, 1911.

1. CRIMINAL LAW: Statutory Offenses: Indictment. The general rule is that it is sufficient, in an indictment charging the commission of an offense created by statute, to follow the language of the statute.

2. ———: Setting Up Gaming Devices: Information: Designating Place. The defendant was prosecuted under an information charging him with having unlawfully permitted certain gaming devices and gaming tables to be set up and used for the purpose of gaming in a certain building. The information did not locate the building other than by designating the county in which the offense was charged to have been committed. *Held*, that this was sufficient.

3. ———: Indictments: Felonies: Misdemeanors. The same nicety is not required in drawing indictments in cases of minor offenses as is required in charging common law felonies.

4. ———: ———: Setting up Gaming Device: Use of Disjunctive and Conjunctive. An information which charged defendant with unlawfully permitting certain gaming devices and gaming tables to be set up *and* used, for the purpose of gaming, in a certain building, etc., was *held* sufficient, although in the statute the disjunctive "or" is used instead of the conjunctive "and," it being *held* that the substitution of the word "and" for the word "or" was immaterial.

5. ———: ———: Statutory Offenses: Use of Disjunctive and Conjunctive. Where a criminal statute uses disjunctive language in defining an offense, the indictment may be drawn in the conjunctive.

6. ———: ———: ———: ———. There is no objection to charging several different actions, any one of which is an offense under the statute, which creates it, in one indictment, although the statute uses the disjunctive form in describing the offense.

7. ———: Information: Charging Two Offenses: Instructing on Only One. Where an information charged defendant with permitting both a crap table and a poker table to be set up and used, but the court withdrew from the jury the charge as to permitting a poker table to be set up and used and instructed alone as to the crap table, *held*, that no prejudicial error ensued by reason of the form of the information.

8. ———: ———: ———: Waiver of Defect: Appeal and Error. Where appellant was prosecuted under an information charging him with permitting both a crap table and a poker table to be set up and used, and he filed no motion to require the state to elect on which charge it would proceed, whether for permitting a crap table or a poker table and no demurrer was filed and the motion to quash covered a different ground altogether, appellant's contention that the information contained four separate and distinct charges is not open for examination for the first time in the appellate court.

9. ———: Setting Up Gaming Device: Sufficiency of Evidence. Defendant was prosecuted under an information charging him with permitting a crap table and poker table to be set up and used for the purpose of gaming. The evidence is examined and held sufficient to carry the case to the jury.

10. PRACTICE: Peremptory Instruction: Demurrer to Evidence. The theory on which a peremptory instruction in the nature of a demurrer to the evidence is considered, is that the demurrant, for the purpose of the demurrer, admits as true all the material evidence presented by his adversary without reference to contradictory testimony, and the question to be answered is, taking that evidence for all it is worth, has a prima facie case been established?

Appeal from Dent Circuit Court.—*Hon. L. B. Woodside,* Judge.

AFFIRMED.

*W. P. Elmer* and *J. J. Cope* for appellant.

(1)  There is only one count in this information, and there are four separate and distinct charges, one that defendant did unlawfully permit one crap table, upon which dice are used, and one poker table, upon which cards are used, to be set up and used; to set it up is one offense and to use it is quite another offense; here it is charged that the two tables have been set up, which is two offenses, and two tables have been used, which, under the statute would constitute if all committed four distinct offenses; it is true four different counts could have been used, but the state elects to charge all four offenses in one count, and the court refused to quash the information, or to compel the state to elect on which of the charges it would stand, and allowed the case to go to the jury over the objections of the defendant, after every possible effort to prevent the error. State v. Rosenblatt, 185 Mo. 114; State v. Blakely, 184 Mo. 187; State v. Fox, 148 Mo. 517.  (2)  Defendant is not guilty and should have been discharged at the close of the evidence on the part of the state.  State v. Ebert, 40 Mo. 187.  (3)  The information on motion of the defendant in this case should have been quashed.  The defendant has a right to know, and it must appear from the face of the information where the offense, if any, was committed.  State v. Kindrick, 21 Mo. App. 507; State v. Fugitt, 66 Mo. App. 625.

*Lawrence T. McGee,* Prosecuting Attorney, and *Eugene W. Bennett,* Assistant Prosecuting Attorney, for respondent.

(1) The information is valid and sufficient and concisely presents the charge under the statutes. R. S. 1909, sec. 4753; State v. Dyson, 39 Mo. App. 297; State v. Lee, 228 Mo. 456; State v. Scaggs, 33 Mo. 92; State v. Locket, 188 Mo. 415. (2) The information is sufficient against the attack "that it should have described the building" and the cases in appellants brief are not in point and do not bear out their contention; in the cases cited no mention whatever was made of where the disturbance took place, whether in a house, tent or harbor, but in the case at bar the information follows the words of the statute, viz., in a certain "building;" a more particular description of the house is not of the essence of the offense, for any house to which the parties who wish, may go and indulge in gaming in its various forms is a gambling house. State v. Mosby, 53 Mo. App. 571. (3) The information is not bad for duplicity because it states that the tables were "set up and used." In addition to proving that the table was set up, it would be essential to show that it was used and certainly there would be no error in alleging such fact. State v. Fletcher, 18 Mo. 425; State v. Nelson, 19 Mo. 393; State v. Myers, 20 Mo. 411; State v. Heinze, 45 Mo. App. 410; State v. Cannon, 134 S. W. 513. (4) There was no motion or request for the state to elect on which charge it would proceed, whether for permitting a "crap table" or "poker" table and such objection cannot be raised for the first time on appeal, and besides the court instructed alone on the charge pertaining to the crap table and defendant was convicted alone on that charge. State v. Blakely, 184 Mo. 187; State v. Harding, 184 Mo. 190; State v. Hartzell, 184 Mo. 191; State v. Cannon, 134 S. W. 513.

NIXON, P. J.—Appellant was convicted upon an information under section 4753, Revised Statutes 1909, charging "that Will Hogle on the——day of May, 1909, at the county of Dent and state aforesaid, did then and there unlawfully permit certain gaming devices and gaming tables, to-wit: One crap table commonly so called, upon which dice are used, one poker table commonly so called, upon which are used poker chips, commonly so called, and cards commonly called playing cards, which said gaming tables and gaming devices were adapted, designed and devised for the purpose of playing games of chance for money and property, to be set up and used for the purpose of gaming, in a certain building there situate and under the control and occupied by him, the said Will Hogle, against the peace and dignity of the state."

Upon trial in a justice's court, defendant was found guilty and his punishment assessed at a fine of fifty dollars. After appeal taken, trial anew was had in the circuit court where the accused was again found guilty and his fine fixed at one hundred dollars. He has appealed.

I. Before the introduction of any evidence, defendant moved to quash the information "for the reason that it does not locate any building, nor where said gambling tables were kept." Appellant's contention is that the location of the "building" must appear on the face of the information. We had a similar question under review in the case of State v. Newman, 132 S. W. 753, where the indictment charged that the defendant "at the county of Butler, State of Missouri, on or about the 21st day of January, 1909, did then and there unlawfully set up and keep a common house of assignation." Defendant moved to quash because the location of the house was not set out and described with sufficient particularity. Our language in that case effectually disposes of the contention in this: "The general rule is that it is sufficient, in an

indictment charging the commission of an offense created by statute, to follow the language of the statute; and this indicment fully complies with that requirement. In the case of State v. Raymond, 86 Mo. App. 537, an indictment, based on the same statute as that on which the indictment in the present case rests, charged that the defendant on a certain date, 'at the county of Bates and State of Missouri, did then and there unlawfully keep and maintain a bawdy house,' etc., with no more particular description of the 'bawdy house.' The court said: 'It has been held in this state that it is sufficient that the indictment charges the offense to have been committed in the county where the prosecution is commenced." [See, also, State v. Ramsauer, 140 Mo. App. 401, 124 S. W. 67.]

Again, as we said in the case of State v. Seiberling, 143 Mo. App. l. c. 321, 127 S. W. 106, the same nicety is not required in drawing indictments in cases of minor offenses as is required in charging common-law felonies. [State v. Fletcher, 18 Mo. l. c. 427; State v. Nelson, 19 Mo. l. c. 396.] We are of the opinion that the charge was sufficiently definite and certain to inform the defendant of the offense he was called upon to meet.

II.    Appellant contends that the information contains four separate and distinct charges, "that the defendant unlawfully permitted one crap table upon which dice are used, and one poker table upon which cards are used, to be set up and used;" that the charge that the two tables have been *set up* contains two offenses, and the charge that the two tables have been *used* contains two offenses. At the close of the evidence, defendant moved that the state be required to elect whether it would prosecute the defendant for permitting a gaming device to be set up, or for permitting the gaming device to be used, which motion was denied.

The statute (sec. 4753, R. S. 1909) provides: "Every person who shall permit any gaming table, bank or device to set up *or* used for the purpose of gaming,"

etc.   It was held in State v. Pittman, 76 Mo. 56, that
where a criminal statute uses disjunctive language in de-
fining an offense, the indictment may be drawn in the
conjunctive.   Thus, where the statute provides a pun-
ishment to every person who shall "set up or keep a
common bawdy house," a charge that the defendant "did
unlawfully set up  and keep a common bawdy house"
was sustained.   The substitution of the word "and" for
the word "or" was immaterial, said the court.   [State
v. Bregard, 76 Mo. 322.] In the case of State v. Cannon,
(Mo. Supp.) 134 S. W. l. c. 514, KENNISH, P. J., said:
"Complaint is made that the court erred in overruling
defendant's motion to require the state to elect upon
which of the several charges contained in each count of
the information it would proceed to trial.   Each count
charged the setting up and keeping of one gaming table
only, and the averment that the defendant enticed and
permitted divers persons to bet and play thereon did not
make the count double, and the motion to elect was prop-
erly overruled."   In State v. Fletcher, 18 Mo. 425, the
contention was made that the offense consists in per-
mitting the gaming device "to be set up or used," and
not in both setting up and using.   In denying the sound-
ness of this contention, the court said:   " . . .  there
is no objection to charging several different acts, either
one of which is an offense under the statute which
creates it, in one indictment, although the statute uses
the disjunctive form in describing the offense."

The trial court in the only instruction given for the
state withdrew from the jury the charge as to permitting
a poker table to be set up and used and instructed alone
as to the crap table.   By no reasoning, therefore, can it
be maintained that prejudicial error ensued by reason of
the form of the information.

Besides, there was no motion or request to require
the state to elect on which charge it would proceed,
whether for permitting a crap table, or a poker table.
No demurrer was filed and the motion to quash speci-

fied only the one ground that the information failed to describe the particular locality of the building. Objections of this character are not open for examination for the first time in this court. [State v. Blakely, 184 Mo. l. c. 189, 83 S. W. 980, and cases cited.]

III.   It is finally argued that the court erred in refusing to give defendant's peremptory instruction which was offered at the close of the state's evidence and again at the close of all the evidence. This is on the theory that the state failed to prove that the room in the building where the crap table was found was in the actual possession or control of the defendant, but was, appellant contends, in the actual possession and control of another to whom he had rented it. This contention if well founded, would require a reversal of the judgment. [State v. Ebert, 40 Mo. 186.] In the case just cited, defendant requested an instruction which told the jury that if they believed the premises in which the gaming device was set up was in the actual possession of another and that defendant did not have the actual possession thereof, they should find for the defendant. The court held that the instruction should have been given.

Keeping in mind the rules which guide appellate courts in analyzing a case where the appellant is urging that his demurrer to the evidence should have been sustained, let us look to the evidence in this record.

In May, 1909, the defendant conducted a hotel in the town of Salem, Dent county, Missouri, in a building in which there were other tenants,—Terrell, McSpadden, Bennett, and Dr. Lowery who owned a drug store on the first floor at the extreme western side of the building. The front part of the basement under this drug store was used as a pool room. Dr. Lowery testified that defendant had made an arrangement with his (Lowery's) business associate to cut off a portion of the basement to which he (Lowery) was entitled, and that it was cut off by being made into a small room; that the front part of the base-

ment under his store was occupied by defendant, and
that this small room was, he thought, added to that; that
it belonged to the pool room. Charley Hickman, a car-
penter, testified that he constructed a room about four-
teen feet square in the basement under Lowery's store
and then cut a hole for a door from that room into the
pool room; that defendant had him do this work and
paid him for it. Hugh Smith testified simply that he was
in this basement in the year 1909 where he saw tables and
men rolling dice and betting money, and that defendant
was one of them. C. M. Mosley stated that he gambled
at this place from seven till one o'clock on the night of
May 7, 1909; that the crap table was about six feet long
and had three or four thicknesses of blankets on it;
the men (defendant among them) shot craps,
betting from twenty-five cents to four dollars; that de-
fendant seemed to be running the affair down there;
that the witness while playing poker there the same
night purchased poker chips from defendant who had
them in a black tin box. He also testified: "Well in
the dice game I saw Mr. Hogle shoot the dice the same
as the rest of us; when some of them seemed like they
were getting a little backward about shooting, Mr. Hogle
said he believed by G-d he would go, he had a game up-
stairs that would beat that, but he never went at that
time." John W. Jacks, the city marshall who raided
this place on May 29, 1909, stated that he saw Jacobs
and Robertson and Halbrooks in this small room
shooting craps on this blanket-covered table and arrested
them, taking charge of the money on the table. That im-
mediately after he left these men at the police court de-
fendant saw him on the street and called to him. "I
heard some one halloo, 'Hey! Jack,' and I looked around
and it was Hogle coming across the street and he said,
'Well, have you got some of the boys?' and I said, 'Yes,
I have got three of them.' He said, 'How did you get
them?' and I said, 'I went into where they were playing
and got them.' He said, 'If that damn Jacobs hadn't

been drunk you wouldn't have got in there.' " He stated that when he made the raid, one of the men in the small room who had perhaps heard him walking, looked out. "I was right at him and he went to draw back and I reached out my left hand and grabbed him and stepped to the door." That the defendant came to the police court and paid the fines assessed against those taken in the raid.

Defendant in his own behalf stated that he "borrowed" the space in the basement for this little room from Lowery's business associate and put "some old tables and various things like that in there; these old tables had been left over from the old hotel; I had a lot of things piled up in there;" that this small room goes with the pool room; that there was a lot of plunder in there,— some old lamps broken up and lying about the floor. "Q. Who uses that room? A. I had it rented to George Elmer up to about the first of May some time. Q. That little room where they say they saw the gambling? A. Yes, sir; I told him that he could use that if he wanted to; it was borrowed there for a cloak room, but when I rented the pool room to Mr. Elmer I said that I supposed he could use this little room. Q. Tell the jury who occupied or had control of this room in the month of May? A. Well, I'll tell you how that is: I had that rented to George Elmer and I rented it to him until about the first of May and he said that he was going away before long and he said to me, 'Ab Murray is talking about renting the pool room of you and he would be a good man to rent it to and he is sober and good pay,' and I said, 'Well, there ain't much doing down there, nobody is making much money out of it now.' And my understanding was that Mr. Elmer told Mr. Murray that he could get that pool room from me and at that time Mr. Murray was running the pool room without any agreement exactly from me only that is I understood that he was going to take the pool room. I had nothing more to do with it. Mr. Elmer paid me rent up until about the first of May and at that time I turned it over to Mr. Murray and I

don't know whether he had it or whether Elmer had it yet but I supposed from what Mr. Elmer said since he came back that he turned it over to Mr. Murray and Mr. Murray afterwards got in a little trouble here and went away and I never heard no more about it. I never got my rent out of it and he went away. Q. State to the jury whether you put these tables in this little room as gambling devices or whether you maintained them as gambling devices? A. No, sir; in moving around the house as I had fitted the house almost new the tables and chairs and stuff, old stuff, was put where they could put them and some of that stuff was put in this room and some in other parts of the cellar and various places—just stowed away where I could—and when I would get a chance to sell them I would sell them. You see, in the pool room the tables take up all the room and there is not a place for a man to shoot if others are standing around, and I made this little place for a man to put his cloak and hat and things and the room is there and they may have been gambling in there but I had no control over it. . . . . I didn't know they were down there at all; I would rather they wouldn't be down there; I have a hotel upstairs and there might be a crowd up there but I am not looking after any gambling down stairs, but upstairs the traveling men play cards all the time in all hotels and I can't keep them from it; I can't tell when they are gambling and when they are not because they don't have the money up, and if they were gambling down there it was unbeknownst to me. Q. How much rent did Mr. Elmer pay you on this room? A. Various sums, one time he paid me a certain sum and another time he paid me a different sum. Mr. Elmer had charge of the pool room until he went away; I don't know whether he had charge of the pool room or not but Mr. Elmer went away and I don't know whether Mr. Elmer had charge of it or Mr. Murray; at that time I was charging Mr. Elmer just a mere pittance for rent for there wasn't any trade there. I didn't take out my li-

cense until sometime in July or August. Prior to that time I had rented it to various persons. Q. Did you ever use it for a cloak room? A. Well, overcoats and hats; haven't you got a place in your house where you put some plunder?" He stated that he merely loaned the money with which to pay the fines to those who were taken in the raid.

No witness ever saw Elmer or Murray around there exercising or claiming to exercise authority over the premises. Defendant as a witness denied that he knew there was gambling down in the basement in contradiction to the evidence of the state to the effect that defendant himself was seen engaged in gambling in this little room.

For the defendant the court gave the following instruction: "Before you can convict defendant of this charge you will have to find from the testimony beyond a reasonable doubt that defendant permitted a gaming table to be set up and used on premises under his control and occupied by him. And if he had rented said building or room to George Elmer or Albert Murray and they were in control of said room at the time of the alleged offense, then you will find the defendant not guilty." Again, the state's instruction required the jury to find this place was occupied by and was under the control of the defendant before they could find him guilty.

We think there was sufficient evidence to authorize the court to submit the case to the jury. It is the peculiar province of the jury to determine the weight to be given to the testimony of the witnesses. The theory on which a peremptory instruction in the nature of a demurrer to the evidence is considered is that the demurrant, for the purposes of the demurrer, admits as true all the material evidence presented by his adversary, without reference to contradicting testimony, and the question to be answered is, taking that evidence for all it is worth. Has a prima facie case been established? We think there was abundant evidence in this record to

carry the case to the jury and we cannot disturb their conclusion. The judgment is accordingly affirmed. All concur.